IN THE UNITED STATED DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| ANTHONY C. LYMON, (B05489), | ) | No. 17 CV 50093 |
| | ) | |
| *Plaintiff*, | ) | Magistrate Judge Iain D. Johnston |
| | ) | |
| v. | ) | |
| | ) | |
| WEXFORD HEALTH SERVICE, INC. et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

**REPORT & RECOMMENDATION**

Plaintiff Anthony C. Lymon alleges that while incarcerated at the Dixon Correctional Center, defendants were deliberately indifferent to a growing precancerous mass in his abdomen. *See* 42 U.S.C. § 1983. In response, defendants assert the affirmative defense of failure to exhaust administrative remedies. The Court then conducted a hearing under *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008). For the reasons set forth below, the Court finds that, except for defendant Dr. James, the defendants have not met their burden to show that plaintiff failed to exhaust his administrative remedies. Therefore, it is this Court's Report and Recommendation that (1) plaintiff's claims against Dr. James be dismissed for failure to exhaust, and (2) the remaining defendants' affirmative defense of failure to exhaust be denied and that plaintiff's case against them be allowed to proceed.

**I. BACKGROUND**

During all times relevant, plaintiff was incarcerated at the Dixon Correctional Center ("Dixon"). According to the plaintiff's allegations, on May 5, 2016, Dixon medical providers observed plaintiff's worsening renal functioning that was caused by a growing mass in plaintiff's abdomen. As early as July 2016, medical professionals including defendant Dr. Timothy Chamberlain believed that the mass in his abdomen was "highly suspicious for malignancy." First Am. Compl. at ¶¶ 36–37, 45.  Plaintiff then underwent a variety of medical procedures, including CT scans, ultrasounds, and visits to medical professionals for diagnosis. Medical professionals including Dr. Chamberlain continued to believe the growing mass was precancerous and possibly malignant.

Plaintiff alleges that from May 2016 through May 2017, he was referred three times for imaging of the mass and eight times for follow-ups with specialists at the University of Illinois at Chicago ("UIC"). *Id*. at ¶¶ 72, 105. As time passed the mass grew, displacing plaintiff's internal organs and allegedly causing severe debilitating pain and discomfort. Plaintiff alleges Dr. Chamberlain failed to send plaintiff's medical records to UIC for his first referral, delaying his

treatment. In January 2017, Dr. Chamberlain "inexplicably" treated plaintiff as if he had an ulcer despite his long medical history regarding the mass in plaintiff's abdomen. *Id.* at ¶ 70. Dr. Chamberlain then referred plaintiff for imaging for the third time and to UIC for the fourth time. After a few more consultations and visits to medical professionals, Dr. Chamberlain approved plaintiff's surgery to drain the mass, which was performed on June 14, 2017. The mass has since recurred and plaintiff's treatment is ongoing.

According to plaintiff's testimony at the *Pavey* hearing and relevant exhibits, plaintiff filed two emergency grievances upon which he relied to demonstrate that he exhausted his administrative remedies. He filed the first on January 23, 2017 after he had been to imaging twice and UIC three times. On the grievance form,[1] plaintiff described the treatment of the mass up to that point. Dkt. No. 100 Ex. 3. Plaintiff claimed that during a January 23, 2017 visit, Dr. Chamberlain treated him as if he had an ulcer despite Dr. Chamberlain knowing that the mass was the true source of plaintiff's medical issues. Plaintiff also claimed that when he left that appointment with Dr. Chamberlain, he overheard other medical personnel say that plaintiff had no ulcer symptoms and that the plaintiff should have been out for a biopsy or surgery. *Id*. On January 24, Dixon's Chief Administrative Officer ("CAO") deemed the grievance not an emergency and checked a box on the form directing plaintiff to proceed with the normal grievance process. *Id*.

On January 25, 2017, during plaintiff's third imaging referral, a medical provider expressed concern that the mass had not been be removed. Later that day, plaintiff filed his second emergency grievance in which he described hearing a radiologist say during the third referral that "they should have been (sic) removed the mass in his stomach," highlighted the allegedly repetitive and unnecessary imaging appointments and referrals and sought immediate removal of the mass. He described how the mass had grown and displaced internal organs, increasing pain and discomfort, and his belief that sending him for another CT scan was unnecessary as his doctors had possessed that same information since July of 2016. Dkt. No. 100 Ex. 4. The CAO similarly denied this grievance as a non-emergency on January 26, 2017 and checked off the box on the grievance form directing plaintiff to resubmit the grievance using the normal procedures. *Id*. On January 30, 2017, plaintiff sent the denied grievances to the ARB with a letter briefly describing his dissatisfaction with the progress of his medical treatment. The ARB returned the grievances to plaintiff on November 22, 2017 indicating that they needed plaintiff to provide copies of his counselor's, Grievance Officer's, and CAO's responses to the grievances.

## II. ANALYSIS

The Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust all administrative remedies available to them before they may have their claims heard in a federal court. 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 544 F.3d 739, 740 (7thCir. 2008). To exhaust administrative remedies, a prisoner must comply with the procedures and deadlines set forth in

---

[1] The grievance forms plaintiff filed in this case were written in the Spanish language. But the plaintiff testified that a Spanish-speaking inmate helped him with the form, and he does not otherwise contend that he did not understand the form.

the prison's policy. *Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016). Exhaustion is a precondition to filing suit in federal court; thus, an inmate may not exhaust his administrative remedies after filing. *Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004). The Seventh Circuit employs a strict compliance approach to the exhaustion requirement. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). The exhaustion requirement is meant to put prison officials on reasonable notice of a prisoner's problem and allow them an opportunity to address it before the filing of a lawsuit. *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013). The defendants bear the burden of proving plaintiff failed to exhaust his administrative remedies. *Id*. at 645, 650.

The applicable administrative remedies available to Illinois inmates are found in 20 Ill. Admin. Code § 504.800–70 which require prisoners to follow a three-step process to exhaust their administrative remedies: (1) informally attempt to resolve the grievance with a prison Counselor, (2) formally file the grievance with the prison's Grievance Officer within 60 days of the incident giving rise to the complaint, and (3) if the prisoner is not satisfied with the Grievance Officer's response, to file an appeal to the ARB within 30 days of the date of the Grievance Officer's decision. 20 Ill. Admin. Code §§ 504.810, 830, 850. The grievance must contain as much factual detail as possible regarding the incident, including relevant names, dates, and locations. However, where names are not known, "the offender must include as much descriptive information about the individual as possible." Ill. Admin. Code § 504.810.

Alternatively, a prisoner may seek to have their grievance reviewed on an emergency basis. The applicable administrative remedies available to Illinois inmates seeking emergency relief in January 2017, when plaintiff filed his emergency grievances, were found in 20 Ill. Admin. Code § 504.840–50 (2003) (subsequently amended April 1, 2017). These regulations required emergency grievances be sent directly to the CAO. If the CAO determined there was substantial risk of imminent personal injury or serious or irreparable harm to the prisoner, the grievance would be handled on an expedited emergency basis. *Id*. at 504.840(a). If the CAO denied giving the grievance emergency status or the inmate was otherwise not satisfied with the CAO's response, the inmate could appeal that decision to the Administrative Review Board ("ARB") within 30 days. *Id*. at 504.850. Additionally, "[t]here is nothing in the [pre-April 1, 2017 amendment] regulatory text . . . that require[d] an inmate to file a new grievance after learning only that it will not be considered on an emergency basis." *Thornton v. Snyder*, 428 F.3d 690, 694 (7th Cir. 2005); *see also Glick v. Walker*, 385 F. App'x 579, 583 (7th Cir. 2010); *Muhammad v. McAdory*, 214 F. App'x 610, 613 (7th Cir. 2007); *Mims v. Hardy*, No. 11 CV 6794, 2013 U.S. Dist. LEXIS 78615, at *16–24 (N.D. Ill. June 5, 2013). Prison officials may not frustrate a prisoner's attempt to exhaust by imposing requirements beyond those in the grievance procedure established by statute and administrative regulation. *Glick*, 385 F. App'x at 583 (citing *Dole*, 483 F.3d at 809); *Muhammad*, 214 F. App'x at *614 (citing *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)).

In this case, plaintiff testified that he filed each of his emergency grievances with the warden at Dixon and that the warden denied each grievance as non-emergencies. Plaintiff then mailed both denied grievances to the ARB on January 30, 2017, along with a letter to the ARB asking the ARB to review the warden's decision, just as established procedures required. The ARB returned the grievances to plaintiff requesting the counselor's, grievance officer's, and CAO's responses to the grievances. Plaintiff understood this to mean that the ARB was asking

3

for documentation showing that plaintiff had filed his grievance through the standard grievance procedure. Plaintiff testified that he was aware of the standard grievance procedures and received an inmate handbook when he was first incarcerated at Dixon in 2010, but he did not remember that the handbook gave any instruction as to emergency grievance procedures. He additionally testified that the prison's law library contained no information regarding a requirement to resubmit a denied emergency grievance as a standard grievance.

Defendants brought evidence suggesting that at the time plaintiff filed his grievances, it was prison policy to require inmates to resubmit denied emergency grievances as a normal grievance after being denied review by the ARB. For instance, the Dixon superintendent Troy Hendrix testified that Administrative Directive 041114 required inmates to refile their denied emergency grievances in the ordinary manner. Additionally, ARB Chairperson Debbie Knauer testified that according to her training and Departmental Regulation 504, as of January 2017, denied emergency grievances were required to be refiled using the normal grievance process.

However, neither Administrative Directive 041114, Departmental Regulation 504, nor the version of the orientation manual that would have been supplied to the plaintiff were provided during the hearing or otherwise offered as evidence in this case. Additionally, Hendrix stated that Administrative Directive 041114 would not have been given in full to the inmates but instead would be given in an abbreviated version in an inmate's orientation manual. Again, plaintiff credibly testified that to his knowledge there was nothing regarding the emergency grievance process contained in the original orientation manual he received in 2010. He also stated that neither Administrative Directive 041114 nor Departmental Regulation 504 was available in the prison's law library. On balance, the defendants have not established that any of these materials were given to inmates or made available to them in the prison library or elsewhere.

More importantly, assuming there were a policy in place at Dixon requiring inmates to refile denied emergency grievances using the normal grievance process, there is no such requirement found in the relevant regulatory text. *See* 20 Ill. Admin. Code § 504.840–50 (2003) (subsequently amended April 1, 2017); *Thornton*, 428 F.3d at 694. Prisoners are required to look only to the steps laid out in the regulatory text to exhaust their administrative remedies; a prison cannot add its own steps in addition to those required by the regulatory text. *See Muhammad*, 214 F. App'x at *614 (citing *Thornton*, 428 F.3d at 694); *Mims*, 2013 U.S. Dist. LEXIS 78615, at *16–18, *22–23 (affidavit from ARB Chairperson and prison grievance counselor stating the existence of a policy requiring resubmission of denied emergency grievance insufficient to show failure to exhaust; prison officials cannot require more than the Illinois Administrative Code requires). The defendants have failed to carry their burden to prove plaintiff failed to exhaust his administrative remedies because the regulations as they existed at the time plaintiff filed his emergency grievances did not require refiling through the normal grievance procedures after being denied by the CAO and the ARB; rather, "one pass at the ARB was enough." *Glick*, 385 F. App'x at 583 (citing *Thornton*, 428 F.3d at 694); *see also Brown v. Obaisi*, No. 16 CV 10422, 2018 U.S. Dist. LEXIS 158761, at *15–16 (N.D. Ill. Sept. 18, 2018); *Williams v. Kelly*, No. 15 CV 8135, 2018 U.S. Dist. LEXIS 67443, at *8–10 (N.D. Ill. Apr. 23, 2018).

Next, plaintiff sufficiently identified Dr. Chamberlain in both of his emergency grievances. The exact names of the defendants are not required to satisfy Illinois administrative rules; instead, "when the names of individuals are not known . . . the offender must include as much descriptive information about the individual as possible." Ill. Admin. Code § 504.510(c). The purpose of this requirement is to put prison officials on notice of an issue at the prison. *Turley*, 729 F.3d at 650; *Kyles v. Beaugard*, No. 15 CV 8895, 2017 U.S. Dist. LEXIS 150764, at *24–25 (N.D. Ill. Sept. 18, 2017) (quoting *Maddox v. Love*, 655 F.3d 709, 722 (7th Cir. 2011)); *see also Jordan v. Stahr*, No. 11 CV 2362, 2015 U.S. Dist. LEXIS 30202, at *16–18 (N.D. Ill. Mar. 11, 2015); *Charles v. Shaw*, No. 10 CV 4069, 2011 U.S. Dist. LEXIS 71728, at *11–13 (N.D. Ill. July 5, 2011). In this case, plaintiff explicitly mentioned "Dr. Chamberlin" (sic) in both of his emergency grievances. *See* Dkt. 100 Ex. 3, 4. He also adequately described the nature of his issues with his medical treatment; in both grievances he described the mass in his abdomen, the many delays in surgery, and his belief that much of his treatment had been repetitive, unnecessary, and unhelpful. *Id*. Thus, plaintiff's emergency grievances put officials at Dixon on notice of possible issues regarding Dr. Chamberlain's treatment of plaintiff's medical problems. *See Gonzalez v. Obaisi*, No. 13 CV 5766, 2015 U.S. Dist. LEXIS 37065, at *8–9 (N.D. Ill. Mar. 23, 2015).

For similar reasons, plaintiff's grievances also adequately identified Wexford. Again, plaintiff did not need to name Wexford or identify a policy of Wexford to exhaust his remedies; all that was required was for plaintiff's grievances to put administrators at Dixon on notice of the alleged problem with a fair opportunity to respond. *See Maddox*, 655 F.3d at 722; *Turley*, 729 F.3d at 650; *Kyles*, 2017 U.S. Dist. LEXIS 150764, at *24–25. Here, both of plaintiff's emergency grievances describe issues he had with the medical care he was receiving for the growth in his abdomen and delays in treatment while housed at Dixon. "As the provider/employer of Dixon's medical staff, Wexford was presumably in a position to address the plaintiff's concerns about the quality of his medical care." *Williams v. Carter*, No. 12 CV 50140, 2012 U.S. Dist. LEXIS 145655, at *6 (N.D. Ill. Oct. 10, 2012); *see also Ford v. Ghosh*, No. 12 CV 4558, 2014 U.S. Dist. LEXIS 124653, at *18–19 (N.D. Ill. Sept. 8, 2014). Plaintiff exhausted his administrative remedies as to Wexford because his emergency grievances were enough to put Dixon on notice of his issues with the medical treatment he was receiving for the mass in his abdomen.

However, the same cannot be said for Dr. Marshall James. Dr. James was not named in either of the emergency grievances. Although the administrative rules do not require identifying individuals by name, see Ill. Admin. Code § 504.510, nothing in either grievance would have put prison officials on notice of issues regarding Dr. James's treatment of plaintiff. Plaintiff filed his emergency grievances on January 23 and 25, 2017, but plaintiff alleges that Dr. James first treated him on February 7, 2017, two weeks after the grievances were filed. First Amen. Compl. at ¶ 80. When the grievances were filed in January 2017, administrators at Dixon would have no reason to believe plaintiff had issues with Dr. James's treatment because Dr. James had not yet been involved in plaintiff's treatment. *See Turley*, 729 F.3d at 650; *Fenton v. Wexford Health Sources, Inc.*, No. 14 CV 6921, 2018 U.S. Dist. LEXIS 166753, at *10–11 (N.D. Ill. Sept. 27, 2018). Therefore, defendants have met their burden to prove that plaintiff has failed to exhaust his administrative remedies as to defendant Dr. James.

## II. CONCLUSION

For the reasons above, the Court finds that the plaintiff did not exhaust his administrative remedies as to Dr. James; however, the plaintiff did exhaust his administrative remedies as to the remaining defendants. It is this Court's Report and Recommendation that plaintiff's claims against Dr. James be dismissed without prejudice and all claims against the remaining defendants be allowed to proceed.

Any objections to this Report and Recommendation must be filed by November 29, 2018. Failure to object may constitute a waiver of objections on appeal. *See Provident Bank v. Manor Steel Corp.*, 882 F.2d 258, 260 (7th Cir. 1989).

Entered: November 15, 2018         By:_____
                                       Iain D. Johnston
                                       U.S. Magistrate Judge